**EXHIBIT A**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x

ENRIQUE BRATHWAITE,                 :

        Plaintiff,           :

        vs.                  : Case No.

VANCE FEDERAL SECURITY SERVICES,    : 2006-CA-003877B

INC.,   :                           :

        Defendants           :

- - - - - - - - - - - - - - - - -x

    Deposition of ENRIQUE BRATHWAITE, held at the offices of Jackson Lewis, LLP, 8614 Westwood Center Drive, Suite 950, Vienna, Virginia, commencing at 9:15 a.m., Monday, November 27, 2006, before Elizabeth Mingione, Notary Public.

HENDERSON LEGAL SERVICES
1015 15th Street, Suite 525
Washington, D.C. 20005

**Page 6**

1  possible for the two of us.
2     A deposition is just basically a question
3  and answer session under oath. I'm going to be giving
4  you questions, and it's your job today to give me
5  answers to the best of your ability to recall. Do you
6  understand that?
7     A.  Yes, sir.
8     Q.  Okay. You have taken an oath to tell the
9  truth. It's the same oath that you would take if we
10 were in court, enforced by the penalty of perjury. Do
11 you understand that?
12    A.  Yes, sir.
13    Q.  Okay. For the court reporter's benefit,
14 it's important we do a couple things that aren't
15 necessarily the way we would talk if you and I were
16 just chatting across the table. One of them is that
17 you have to answer audibly, something we can all hear
18 and understand. So "yes", "no" instead of shaking
19 your head, nodding your head.
20    A.  Yes.
21    Q.  Saying "uh-huh" or "huh-uh" because that
22 doesn't always translate real well. Everybody messes

**Page 7**

1  that up at some point during the course of a
2  deposition. And I will just ask you was that a "yes"
3  or was that a "no."
4     And I'm doing that not to either suggest
5  and answer or embarrass you but just to make sure we
6  get a clear record. Okay?
7     A.  Yes, sir.
8     Q.  The other thing is sometimes you will sort
9  of see where my question is going, and you may want to
10 jump in and give your answer. I would ask you to wait
11 until I've finished my whole question before you
12 answer, because the court reporter can't take down two
13 of us talking at the same time. Okay?
14    A.  Yes, sir.
15    Q.  All right. And I'll try and extend the
16 same courtesy to you and not step on your lines, and
17 wait until you have finished your whole answer before
18 giving you another question. Okay?
19    A.  Yes, sir.
20    Q.  Great. If at any point along the way today
21 if you need to take a break, just let me know. As
22 long as there's not a question pending, we will do

**Page 8**

1  that. It's my custom to take a break around every
2  hour or so anyway, but you don't necessarily need to
3  wait for me. Okay?
4     A.  Okay.
5     Q.  If at any point in the deposition you don't
6  understand any of my questions, I want you to please
7  tell me that and I'll be happy to rephrase my
8  question. Okay?
9     A.  Okay.
10    Q.  But if you do go ahead and answer, I'm
11 going to assume you understood it. Fair enough?
12    A.  Fair.
13    Q.  Are you under any medication today that
14 would affect your ability to testify?
15    A.  No, sir.
16    Q.  Other than your attorney, have you spoken
17 to anyone in preparation for your deposition today?
18    A.  No, sir.
19    Q.  Have you reviewed any documents in
20 preparation for your deposition today?
21    A.  Yes, sir.
22    Q.  What have you reviewed?

**Page 9**

1     A.  I reviewed the questionnaire that you sent
2  me.
3     Q.  Okay. That would be the interrogatories?
4     A.  Yes, sir.
5     Q.  Okay. And you reviewed your responses I am
6  assuming?
7     A.  Yes, sir.
8     Q.  Anything else?
9     A.  Nothing else.
10    Q.  All right. Now, you started with Vance
11 when? What was your start date, do you remember?
12    A.  I believe it's sometime around November,
13 September, November, December, one of these three
14 months of 2003.
15    Q.  2003. All right. And what was your
16 position when you started?
17    A.  Security officer.
18    Q.  As a security officer what did you
19 understand your job duties to be?
20    A.  To identify and check vehicles, identify ID
21 card for individuals who should be on base, search
22 vehicles, report any unusual thing that happened on

**Page 10**

1  base, just basic security function.
2      Q.   All right. What was your salary when you
3  started?
4      A.   Somewhere in the 30s, anywhere from 35, 37.
5      Q.   During the course of your employment did
6  you ever get a raise?
7      A.   Not that I know.
8      Q.   Let me show you what we'll mark as Exhibit
9  1 to the deposition.
10           - - -
11          (A document was marked as Deposition
12  Exhibit Number 1)
13           - - -
14          BY MR. BROWN:
15      Q.   I'm showing you what was marked as Exhibit
16  1. This is a two-page document with Vance at the top,
17  entitled Security Officer Job Requirements, dash,
18  Government Guard Service. Have you ever seen this
19  document before?
20      A.   No, sir.
21      Q.   In reviewing it, and take whatever time you
22  need, would you agree that the job requirements listed

**Page 11**

1  on the bottom half of page 1 carrying over to page 2
2  are the things that you understood were required to do
3  your job as a security officer at Vance?
4      A.   Yes, sir.
5      Q.   So you understood that as part of your job,
6  looking at kind of the middle of that list of job
7  requirements, that you had to adhere to all company
8  policies and site post orders?
9      A.   Yes, sir.
10      Q.   Okay. When you were hired, you were
11  probably given a bunch of paperwork to sign. Do you
12  recall reviewing the Vance non-discrimination and
13  anti-harassment policy?
14          That's not in the document that you have in
15  front of you.
16      A.   Okay. Yes, sir.
17      Q.   Let me show you what we'll mark as Exhibit
18  2.
19           - - -
20          (A document was marked as Deposition
21  Exhibit Number 2)
22           - - -

**Page 12**

1          BY MR. BROWN:
2      Q.   What we've marked as Exhibit 2 is a
3  three-page document entitled the Vance
4  non-discrimination and anti-harassment Policy. And
5  I'd like to direct your attention to the third page of
6  the document and ask you, first of all, if that's your
7  signature?
8      A.   Yes, sir.
9      Q.   All right. And you signed this
10  acknowledgment of the non-discrimination
11  anti-harassment Policy on September 15, 2003; correct?
12      A.   Yes.
13      Q.   Does that refresh your recollection as to
14  when you started at Vance?
15      A.   Yes.
16      Q.   All right. So this was on or about your
17  first day on the job?
18      A.   I think so. Yes.
19      Q.   All right. In reviewing the
20  non-discrimination and anti-harassment policy, I guess
21  first of all did you read the policy on September 15,
22  2003?

**Page 13**

1      A.   No. I just skimmed through the policy.
2  When it was given, there wasn't time to actually sit
3  there and read it. It just sign it and turn it back
4  in.
5      Q.   At any time later did you read a copy of
6  this policy?
7      A.   It wasn't issued to me. No.
8      Q.   When you skimmed it, did you have any --
9  was there any part of it that you had any questions
10  about?
11      A.   At the moment, no, sir.
12      Q.   I'll show you what we'll mark as Exhibit 3.
13           - - -
14          (A document was marked as Deposition
15  Exhibit Number 3)
16           - - -
17          BY MR. BROWN:
18      Q.   You have before you what we've marked as
19  Exhibit 3 to your deposition. This is a two-page
20  document entitled Vance Standards of Conduct. Is that
21  your signature which appears on page 2 of the
22  document?

Brathwaite, Enrique                                November 27, 2006
Vienna, VA

5 (Pages 14 to 17)

---

**Page 14**

1  A. Yes, sir.
2  Q. And you received this document on February
3  26, 2004; correct?
4  A. Um-hmm. Yes, sir.
5  Q. And what was going on on February 26, 2004
6  that caused you to get a copy of the Standards of
7  Conduct?
8  A. I don't remember. I don't recall.
9  Q. Was there any change in job assignment or
10 anything which prompted you to get a copy of this
11 document?
12 A. Not to my knowledge, sir. I believe
13 everyone received this around the same time.
14 Q. All right. And did you read this over at
15 the time that you received it?
16 A. Never had a chance to read it. No, sir.
17 Q. Okay. Who presented it to you?
18 A. I don't recall.
19 Q. Where were you when you were presented this
20 document?
21 A. I don't remember.
22 Q. You understood that at Vance there was

---

**Page 15**

1  certainly Standards of Conduct that you had to abide
2  by in order to remain employed; correct?
3  A. Yes, sir.
4  Q. And you understood, for example, as listed
5  as the first standard of conduct violation that
6  assault, making or uttering verbal or physical threats
7  would be cause for discharge; correct?
8  A. I assume so.
9  Q. That would be true in any job, wouldn't it?
10 A. Yeah.
11 Q. Okay. Same thing, for example, number 5,
12 the willful or careless destruction of property.
13 That's the type of thing that someone could be
14 terminated for; correct?
15 A. Yes.
16 Q. And you understood that violating any of
17 these Standards of Conduct, that it would be up to
18 Vance to determine what the penalty would be for doing
19 that; correct?
20 A. Yes.
21 Q. They could discharge you or they could do
22 anything other than discharge you; right?

---

**Page 16**

1  A. Yes, sir.
2  Q. Now, during the course of your employment
3  you received a performance evaluation, didn't you?
4  A. Yes, sir.
5        - - -
6     (A document was marked as Deposition
7  Exhibit Number 4)
8        - - -
9     BY MR. BROWN:
10 Q. I'm showing you what we've marked as your
11 performance evaluation which is a two-page document
12 dated March 19, 2004. Have you ever seen this
13 document before?
14 A. No. I don't remember seeing this.
15 Q. It occurred to me that a moment ago you
16 were laughing about something as you were reviewing
17 the document. What about the document did you find
18 amusing?
19 A. The timing of when it was issued, this
20 particular document.
21 Q. Yes.
22 A. Yeah. It's just the timing.

---

**Page 17**

1  Q. I don't understand. What about the timing
2  do you find funny?
3  A. You got the date there 3 March, 19 March of
4  '04. Seems like I should have been given this way
5  before.
6  Q. What makes you say that?
7  A. I mean if I been there since September, why
8  would I get this document almost six months later.
9  Q. Do you know what Vance's policy was with
10 regard to providing performance evaluations to new
11 security officers?
12 A. No. This evaluation came out of nowhere.
13 I was evaluated by an individual who didn't even know
14 me.
15 Q. And the individual signing under evaluator,
16 who is that?
17 A. It says something Cobb.
18 Q. If you look at the top, it lists as David
19 A. Cobb; correct?
20 A. Right.
21 Q. Okay. So you don't know what Vance's
22 policy was with regard to when performance evaluations

---

Page 30

1   Q.  And so there is no reason for this, a
2   three-day suspension. And then can you read the rest
3   of that for me?
4   A.  I said a three-day suspension based on what
5   took place on that day in question. In other words it
6   was not warrant a three-day suspension because I went
7   into a private owned vehicle to assist someone to the
8   PX.
9   Q.  I see. And then is that your signature
10  underneath the statement of officer?
11  A.  Yes.
12  Q.  Did you receive a three-day suspension for
13  this?
14  A.  No.
15          - - -
16      (A document was marked as Deposition
17  Exhibit Number 7)
18          - - -
19      BY MR. BROWN:
20  Q.  I'm showing you what we've marked as
21  Exhibit 7. It is a four-page document, the first page
22  of which is a Security Officer, slash, Employee

Page 31

1   Counseling Form. Is that your signature which appears
2   on the second page of Exhibit 7?
3   A.  Yes.
4   Q.  And the portion on page 2 under Statement
5   of Security Officer, slash, Employee, is that your
6   handwriting?
7   A.  Page 2, yes. Yes, sir.
8   Q.  All right. And you understood that you
9   were being counseled for improperly unloading your
10  weapon inside the security booth; right?
11  A.  Someone told that that's what I did, but I
12  didn't do it. So I have no reason to sign this
13  document. I just gave a statement of what occurred.
14  Q.  Uh-huh. But you understood that that's
15  what the counseling form was for?
16  A.  Yeah.
17  Q.  So someone reported that you had improperly
18  unloaded your weapon inside the security booth; right?
19  A.  Right. That's what they say.
20  Q.  And you deny that took place?
21  A.  Right.
22  Q.  The third page of the document is a

Page 32

1   statement from Joseph Barnett. Do you see that?
2   A.  Yes.
3   Q.  Who is Officer Barnett?
4   A.  He's this tall, heavyset guy that worked
5   the post with me.
6   Q.  How long had you been working with
7   Mr. Barnett?
8   A.  About two months or less.
9   Q.  How did the two of you get along?
10  A.  He didn't care for me.
11  Q.  What makes you say that?
12  A.  He didn't care for me because I didn't go
13  along with his program. He's a big bully. And he
14  have control of all the guards except for me. So he
15  would set people up to go against me.
16      I guess I was a better officer than he was,
17  so there was some challenge there. So he'd rather see
18  me go so that he could prosper.
19  Q.  What race is Mr. Barnett?
20  A.  He's black.
21  Q.  And in what way did -- I think you said he
22  set you up. How did he do that?

Page 33

1   A.  Well, he will instigate anything that
2   happened. He's always loud talking. He would tell
3   people what to do. They would run around and do as he
4   said. But when it comes to me, he couldn't bully me
5   like he bullied the rest.
6   Q.  Page 4 of Exhibit 7 is a statement from a
7   Melvin Blassingame. Who is Mr. Blassingame?
8   A.  He and Mr. Barnett got hired at the same
9   time and they was close buddies. Where you see one,
10  you see the other.
11  Q.  And what race is Mr. Blassingame?
12  A.  He's black.
13  Q.  And so when both Mr. Barnett and
14  Mr. Blassingame report here that they saw you unload
15  your weapon improperly, I take it that they are lying?
16  A.  Yes.
17  Q.  Is that your opinion?
18  A.  Oh, yes. They are lying.
19  Q.  And why are they lying about this?
20  A.  I just explained to you, they wanted me
21  gone. They are buddies. And they trade information,
22  and they make it difficult for somebody like me to

**Page 34**

1  work there.
2     Q.  How did they make it difficult for you to
3  work there?
4     A.  Because they lie, just as you see here, to
5  tell somebody that I unloaded my weapon in the guard
6  shack is ridiculous. It didn't make any sense to me.
7  I wouldn't do that.
8     Q.  But how -- I'm trying to figure out what
9  they would gain by lying about that?
10    A.  I don't know. They saw a better officer
11 and they would rather see me go so that they could
12 look good. As long as I was there, they couldn't look
13 good.
14    Q.  And in what way do you believe that you
15 were a better officer than they were?
16    A.  Because the way I carry myself and the way
17 I conduct myself at the gate. My prior experience was
18 obvious.
19    Q.  And what was different about the way you
20 carried yourself versus the way they carried
21 themselves?
22    A.  They were sloppy. Not blasting him, but

**Page 35**

1  the big guy, he was always sloppy. He just couldn't
2  stand up to me. That's all.
3         I was very neat in appearance. That's one
4  of the reasons why I didn't sign that evaluation
5  because I'm always neat. For somebody to say that I
6  was sloppy makes no sense.
7              - - -
8         (A document was marked as Deposition
9  Exhibit Number 8)
10             - - -
11        BY MR. BROWN:
12    Q.  I'm showing you what we've marked as
13 Exhibit 8. This is a one-page document that is a
14 Charge of Discrimination with the EEOC and Maryland
15 Commission on Human Relations.
16        Is that your signature which appears at the
17 bottom left-hand corner?
18    A.  Yes, sir.
19    Q.  And is this the charge of discrimination
20 that you filed regarding your discharge?
21    A.  Yes, sir.
22    Q.  Okay. And this is the same charge of

**Page 36**

1  discrimination that is then the subject of this
2  lawsuit, your claim that you were discriminated
3  against on the basis of your race for being terminated
4  over the incident with Officer Verdine; correct?
5     A.  Yes, sir.
6              - - -
7         (A document was marked as Deposition
8  Exhibit Number 9)
9              - - -
10        BY MR. BROWN:
11    Q.  I'm showing you what we've marked as
12 Exhibit 9 to the deposition. It's a two-page document
13 which is a letter from the EEOC and then the attached
14 dismissal and notice of rights, both dated February
15 21, 2006. Have you seen these documents?
16    A.  Yes.
17    Q.  And you understood that the first page of
18 Exhibit 9 was the EEOC's letter to you indicating that
19 based on their investigation and due to a lack of
20 evidence, that they could not establish that there had
21 been any discrimination on the part of Vance with
22 regard to your termination; correct?

**Page 37**

1     A.  Would you like to say that again.
2     Q.  Sure. You understood Exhibit 9, first
3  page, to be a letter from the EEOC to you telling you
4  that they were finding that there was no
5  discrimination because of a lack of evidence; right?
6     A.  Yes.
7     Q.  Is there any evidence that you possess that
8  you did not present to the EEOC in the course of their
9  investigation?
10    A.  Not that I know.
11    Q.  And in fact you wrote a rebuttal to Vance's
12 position statement in which you stated your position,
13 which we'll mark here as Exhibit 10.
14             - - -
15        (A document was marked as Deposition
16 Exhibit Number 10)
17             - - -
18        BY MR. BROWN:
19    Q.  So what we've marked Exhibit 10 is a
20 two-page document entitled Rebuttal of Memorandum,
21 dated December 25, 2005. Is this a document you
22 prepared, sir?

**Page 38**

1  A.  Yes.
2  Q.  And did you prepare it in response to and
3  after reading the position statement that was
4  presented by Vance to the EEOC?
5  A.  I wrote this to Vance.
6  Q.  Well, okay, let me make sure that's right.
7  There is another letter which I'll show you on the way
8  here but that you wrote to Vance. The timing of this
9  letter would indicate to me that this was written to
10 the EEOC?
11 A.  Okay. It was.
12 Q.  All right. So just to confirm, you filed
13 your charge of discrimination with the EEOC. Vance
14 submitted a letter, or what's called a position
15 statement to the EEOC setting forth its response. You
16 saw a copy of that; right?
17 A.  Yes.
18 Q.  All right. And in response to that
19 letter --
20 A.  I wrote --
21 Q.  You wrote Exhibit 10?
22 A.  Right.

**Page 39**

1  Q.  Okay. And then after sending Exhibit 10 to
2  the EEOC, they ruled against you; right?
3  A.  Not entirely.
4  Q.  Not entirely? In what way did they rule
5  for you?
6  A.  Well, they knew something happened.
7  Q.  Okay. Well, they didn't find
8  discrimination. I think we can all agree with that;
9  right?
10 A.  That's what they say.
11 Q.  Okay. Fair enough. So this charge of
12 discrimination concerns an incident which took place
13 on March 13, 2004; right?
14 A.  Yes.
15 Q.  Why don't you tell me, if you would, what
16 took place on that day?
17 A.  On that day I showed up to work. And I had
18 the shotgun for more than two hours. And at which
19 time we are supposed to switch every hour and let
20 other individuals carry the shotgun. So I passed it
21 on to Officer Verdine.
22     He took the shotgun. Once his hour was

**Page 40**

1  completed, he decided to give it back to me, while I
2  was checking vehicles and writing tickets. And I told
3  him to give it to either Blassingame or the other big
4  fellow. And they refused to take it from him.
5      So because he was scared of them, he came
6  back to me.
7  Q.  Let me stop you there, if I could, make
8  sure I get this right. First of all, when you refer
9  to the big fella', you are talking about Officer
10 Barnett?
11 A.  Yes.
12 Q.  Okay. And the -- what time did you start
13 your shift that day?
14 A.  It must have been in the morning.
15 Q.  Why do you say it must have been?
16 A.  Or maybe in the evenings, maybe 12 o'clock.
17 I don't know. I don't remember.
18 Q.  And how many security officers were
19 assigned to the gate that day?
20 A.  Myself, Officer Verdine, four, maybe five,
21 five of us. I am sorry.
22 Q.  That would be yourself, Officer Verdine,

**Page 41**

1  Barnett, Blassingame and?
2  A.  Collins.
3  Q.  Collins. I think we've already established
4  that Officers Barnett and Blassingame are black.
5  Officer Verdine is white; correct?
6  A.  Yes, sir.
7  Q.  What about Officer Collins?
8  A.  He's black also.
9  Q.  The shotgun that you are speaking of, is
10 there anything in writing which discusses how often
11 any one person should be carrying the shotgun?
12 A.  The supervisors told us to relieve each
13 others from the weapon every hour.
14 Q.  Who is it that told you that?
15 A.  I believe it was Lieutenant Smith,
16 Lieutenant Colon.
17 Q.  Both of them told you that?
18 A.  Yes.
19 Q.  Okay. So you had the shotgun at the
20 beginning of the shift?
21 A.  Yes.
22 Q.  Did all five of you, referring to the

86

1   A.  Go wash it off.
2   Q.  Referring to the spit on your face?
3   A.  Yes.
4   Q.  So he didn't tell you you'd better leave
5   that on there so that others can see it?
6   A.  Oh, he did say that.
7   Q.  Oh, he did?
8   A.  Yes.
9   Q.  Well, which was it?  Did he tell you to
10  keep it on or take it off?
11  A.  First he says, "Leave it on so that your
12  lieutenant could see it."  And as I was standing there
13  with it on my face, after he made the call, he says,
14  "You can go wash it off because I saw it."
15  Q.  Uh-huh.  All right.  So after talking with
16  Officer Hayes and the other individuals there in the
17  Provost office, what did you do then?
18  A.  Lieutenant Green and Lieutenant Williams
19  showed up.  And Lieutenant Green took a statement with
20  Lieutenant Williams sitting there.  And he asked me
21  questions like you are doing.  And he just start
22  writing.

87

1   Q.  Okay.
2       - - -
3       (A document was marked as Deposition
4   Exhibit Number 12)
5       - - -
6       BY MR. BROWN:
7   Q.  I'm showing you what we've marked as
8   Exhibit 12.  This is a three-page document.  And the
9   last page looks like your signature.  Is that your
10  signature?
11  A.  Yes.
12  Q.  Okay.  So this is the report taken by --
13  A.  Officer Green.
14  Q.  -- Officer Green.  All right.  And this was
15  taken on the date of the incident that we've just been
16  discussing on March 13, 2004?
17  A.  Yes, sir.
18  Q.  And the handwriting which appears under the
19  incident description on page 1, whose handwriting is
20  that?
21  A.  That's mine.
22  Q.  Your handwriting.  All right.  And then

88

1   also carrying over to the top portion of page 2;
2   right?
3   A.  Yes.
4   Q.  Then begins a series of question and
5   answers.  Is that Officer Green's handwriting?
6   A.  Yes.
7   Q.  All right.  You read over his questions and
8   your answers prior to signing the last page of the
9   document; right?
10  A.  Yes, sir.
11  Q.  All right.  And he accurately recorded your
12  questions, rather accurately recorded your answers to
13  his questions; right?
14  A.  I don't know how accurate they were but --
15  Q.  Well, you see there in big bold letters, I
16  have read these questions and answers and agree to
17  their accuracy.  And then you've signed below that.
18  Do you see that?
19  A.  Yes, I signed.
20  Q.  Well, are you now saying that you did not
21  agree to their accuracy?
22  A.  Well, I mean, he wrote what he claimed I

89

1   told him.  And in the end, yeah, I mean, I agreed most
2   of it was okay, so I signed on it.
3   Q.  Well, is there any portion of his questions
4   and answers that he recorded that's inaccurate?
5   A.  I think down here when he said that how
6   many times did you carry the shotgun.  Once for an
7   hour and 15 minutes.
8   Q.  You are referring to?
9   A.  The very beginning of this.
10  Q.  Ah, yes.  For one hour and 15.  Are you
11  saying that's inaccurate?
12  A.  Right.  Because I held it for two hours.
13  Q.  Well, if that's the case, sir, why did you
14  say on here underneath the big bold letters that say,
15  "I've read these questions and answers and agree to
16  their accuracy," why did you sign them?
17  A.  I signed because I was under the impression
18  I was signing based on my statement, not what he puts
19  down there.
20  Q.  Well, that would make sense, I guess, if in
21  fact you hadn't signed on it twice.  I mean you have
22  got your signature there underneath your handwritten

**Page 98**

1    He just took Verdine's side and got rid of
2 me.
3    Q.   When you say a hearing, what are you
4 referring to?
5    A.   Well, explain to me what happened. You
6 know I gave him my portion of it. He listened to what
7 everybody had to say. And then he made his decision
8 up.
9    Q.   You are talking about the incident with
10 Eugene?
11    A.   With Eugene, myself, Campos and Lieutenant
12 Colon.
13    Q.   So in that situation involving Eugene,
14 Mr. Sittner met with all of you together. Is that
15 right?
16    A.   Yes.
17    Q.   And do you have any -- have you ever seen
18 anything in writing which describes the way Vance
19 investigates disputes between employees?
20    A.   No.
21    Q.   Do you know of any policy or practice that
22 Vance has in that regard?

**Page 99**

1    A.   No. This was the first time.
2    Q.   Okay. And in the situation involving you
3 and Officer Verdine, Mr. Sittner spoke with you about
4 your account of what happened; correct? Yes?
5    A.   Yeah. Right there.
6    Q.   Okay. And do you know what else he did in
7 order to look into it?
8    A.   He said he did an investigation.
9    Q.   Do you have any reason to believe that that
10 didn't happen?
11    A.   It has to have been cut and dry because I
12 was fired in no time.
13    Q.   Do you have any reason to believe that
14 Mr. Sittner did not conduct an investigation?
15    A.   I don't know what he did, sir.
16    Q.   Okay. That's --
17    A.   I don't know.
18    Q.   -- exactly what I'm trying to figure out.
19 So you don't know one way or another what Mr. Sittner
20 did to look into the allegations that you raised
21 regarding Officer Verdine; right?
22    A.   Right.

**Page 100**

1    Q.   Okay. Now, let me show you what we'll mark
2 as Exhibit 13.
3          - - -
4       (A document was marked as Deposition
5 Exhibit Number 13)
6          - - -
7    BY MR. BROWN:
8    Q.   Exhibit 13 is a two-page document. It's
9 handwritten. It says, Interview of Enrique Brathwaite
10 on 3/19/04 at 12:35 hours. Is this your handwriting?
11    A.   Mine?
12    Q.   Yes.
13    A.   This?
14    Q.   Right.
15    A.   No.
16    Q.   Okay. You know you met with Mr. Sittner,
17 and he asked you your account of what happened; right?
18    A.   When?
19    Q.   Okay. On March 19, 2004, you met with
20 Mr. Sittner and he asked you what happened; right?
21    A.   Okay.
22    Q.   Is that right?

**Page 101**

1    A.   This was the day that -- I don't remember
2 the dates here.
3    Q.   Well --
4    A.   But I did met with him. Yes.
5    Q.   Okay. And you would agree at least that
6 Exhibit 13 says that the interview took place on March
7 19; right?
8    A.   I'm not sure what day it was.
9    Q.   Well, you would agree with me that Exhibit
10 13 says it took place on March 19?
11    A.   Yes.
12    Q.   Okay. Do you have any reason to believe
13 that that is wrong?
14    A.   What do you mean?
15    Q.   Do you have any reason to believe that it's
16 not March 19 that you know that because --
17    A.   The dates?
18    Q.   Yeah. I'm asking you, for example, I know
19 that on March 19 I was in Timbuktu. So it couldn't
20 have been March 19. I'm asking you if you have any
21 reason to believe that this date on here is incorrect?
22    A.   Maybe not. I am not sure.

**102**

1  Q. Okay. As you sit here today, is there
2  anything that you can tell me that would say, no, I
3  know for a fact it wasn't March 19?
4  A. No. I am not sure.
5  Q. Okay. So whenever it was, you met with
6  Mr. Sittner. Where did you meet?
7  A. In his office.
8  Q. And just the two of you?
9  A. In the provost marshal building. No, it
10 was him and I, and I think Mr. Lewis was there also.
11 Q. Okay. And describe that meeting for me.
12 A. At that meeting, he asked me questions to
13 explain what happened. And I was explaining to him
14 what happened. He was writing stuff down.
15    I don't know what he was writing, but in
16 the end, he wanted me to sign it. And I refused to
17 sign it because I thought he was twisting the words
18 that I was saying.
19 Q. So you read Exhibit 13?
20 A. I didn't -- I didn't read it.
21 Q. You didn't read it. So how do you know he
22 was twisting words?

**103**

1  A. Based on how he was interviewing me and
2  talking to me and some words, something that I didn't
3  agree on, he was sort of like making emphasis that
4  this is what happened. And I know that was not the
5  case, so --
6  Q. Well, give me a specific example?
7  A. I don't --
8  Q. What are you talking about?
9  A. I don't remember anything because I -- I
10 don't remember. But based on interview, in other
11 words, he was twisting the words to make it fit.
12 Q. What words did he twist?
13 A. You could read it.
14 Q. No. I'm asking you what words did he
15 twist?
16 A. I don't remember. I don't remember. But I
17 know that based on the information that I gave
18 Lieutenant Green, I thought this would suffice,
19 instead of me making the second statement.
20 Q. Okay. But you didn't -- let me just
21 clarify. Did you read Exhibit 13?
22 A. No.

**104**

1  Q. Why don't you -- have you ever read Exhibit
2  13?
3  A. I don't think he ever gave me a copy,
4  because I didn't sign it.
5  Q. Well, have you seen it since?
6  A. I'm just seeing it now.
7  Q. Are you seeing it now for the very first
8  time?
9  A. I seen it in a copy that came through from
10 the EEOC.
11 Q. Did you read it at that time?
12 A. I don't think I did.
13 Q. So as we sit here right now, you have never
14 read Exhibit 13. Is that your testimony?
15 A. Right, sir.
16 Q. Okay. Well, this is a good time. Why
17 don't you read Exhibit 13 please. Tell me when you
18 are ready.
19        - - -
20    (The witness reviews a document)
21        - - -
22 A. Okay.

**105**

1  Q. All right. So now having read Exhibit 13
2  for the first time, anything in here strike you as
3  inaccurate?
4  A. Yeah, where Verdine say he was going on a
5  break. That's the reason why he was giving me the
6  shotgun because he was taking a break. He was not
7  going on any break.
8  Q. Well, he went and smoked a cigarette;
9  right?
10 A. He did that later.
11 Q. Okay. So he didn't tell you he was going
12 to take a break?
13 A. No.
14 Q. Okay. Anything else that you think is
15 inaccurate?
16 A. No. Everything else seems to be --
17 Q. Okay. So other than that part about
18 whether he was going to take a break or not,
19 Mr. Sittner recorded your statement to him accurately;
20 right?
21 A. Yeah. But his interview was not being
22 conducted accurate. I mean this is accurate.

**118**

1  investigation a little more thorough. They have
2  cameras that would indicate exactly what happened. I
3  felt confident that that's what they would have done.
4      There's cameras in the back of the guard
5  shack, in front of the guard shack, to the side of the
6  guard shack. They should have monitored 280 degrees
7  around the guard shack.
8      And to say that you didn't see this or you
9  didn't see that, I find that hard to believe.
10  Q.  Other than what you have just testified to,
11  is there any other reason that you believe that you
12  were discharged because of your race?
13  A.  Yes.
14  Q.  What's that?
15  A.  The fact that Officer Verdine did not get
16  any discipline at the time, it clearly shows --
17  indicate to me that because I was black, actions was
18  taken. And no actions was taken on Officer Verdine
19  because he was white.
20  Q.  Other than that, anything else which leads
21  you to believe that you were discharged because of
22  your race?

**119**

1  A.  At this time, I -- I can't come up with
2  anything else.
3  Q.  Let me show you what we'll mark as Exhibit
4  16.
5         - - -
6      (A document was marked as Deposition
7  Exhibit Number 16)
8         - - -
9      BY MR. BROWN:
10  Q.  Exhibit 16 is a one-page document entitled
11  Rebuttal of Memorandum dated March 13, 2004. The
12  document itself appears to be dated March 28, 2004.
13      Is that your signature which appears at the
14  bottom of the page?
15  A.  Yes, sir.
16  Q.  And this is a memorandum that you wrote
17  after being notified that you were discharged;
18  correct?
19  A.  Yes.
20  Q.  And was everything written in Exhibit 16
21  accurate as of your recollection of events as of March
22  28, 2004?

**120**

1  A.  Yes, sir.
2         - - -
3      (A document was marked as Deposition
4  Exhibit Number 17)
5         - - -
6      BY MR. BROWN:
7  Q.  I'm showing you what was marked as Exhibit
8  17. This is an eleven-page document entitled Charge
9  Information Questionnaire. And I believe it to be the
10  questionnaire that you filled out and submitted to the
11  EEOC when filing your charge of discrimination.
12      Is that what you recognize it to be?
13  A.  Yes.
14  Q.  Is all of the handwriting which appears on
15  Exhibit 17 yours?
16  A.  Yes, sir.
17  Q.  And you also prepared the typewritten
18  portion; correct?
19  A.  Yes.
20  Q.  And is everything in Exhibit 17 accurate?
21  A.  Yes, sir.
22      MR. BROWN: Let's take five.

**121**

1         - - -
2      (Recessed at 11:25 a.m.)
3      (Reconvened at 11:39 a.m.)
4         - - -
5      BY MR. BROWN:
6  Q.  Mr. Brathwaite, do you know, in other
7  words, have you met Tim McManus before?
8  A.  No. Except for the last day when I was
9  being fired.
10  Q.  Prior to the day of your termination had
11  you ever spoken with Mr. McManus?
12  A.  I never met him.
13  Q.  Do you have any reason to believe that he
14  would discriminate against you as an African-American?
15  A.  Yes.
16  Q.  What's that?
17  A.  For arriving at the final decision.
18  Q.  Okay. But other than that?
19  A.  I never met the guy.
20  Q.  Okay. Fair enough. Now, do you know who,
21  if anyone, Vance hired to replace you?
22  A.  No.