# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x

ENRIQUE BRATHWAITE,                    :

        Plaintiff,              :

    vs.                                :   Case No.

VANCE FEDERAL SECURITY SERVICES,       :   2006-CA-003877B

INC.,  :                               :

        Defendants              :

- - - - - - - - - - - - - - - - -x


    Deposition of IAN TIMOTHY MCMANUS, held at the offices of Jackson Lewis, LLP, 8614 Westwood Center Drive, Suite 950, Vienna, Virginia, commencing at 12:58 p.m., Monday, November 27, 2006, before Elizabeth Mingione, Notary Public.


HENDERSON LEGAL SERVICES

1015 15th Street, Suite 525

Washington, D.C. 20005

```
                                    14
 1  cameras. There's not always witnesses and cameras.
 2      Q.  Okay.
 3      A.  The compilation of statements and
 4  materials.
 5      Q.  Okay. Now, the cameras, who owns the
 6  cameras?
 7      A.  I believe the Army would own the cameras.
 8      Q.  Okay. Now, Mr. Sittner conducted an
 9  investigation as far as you know?
10      A.  Correct.
11      Q.  Okay. And did he -- do you know if he
12  asked anyone else to help him with this investigation?
13      A.  Not that I'm aware of.
14      Q.  Did Mr. Sittner ever tell you what he did
15  in order to investigate --
16      A.  In the written --
17      Q.  -- this case?
18      A.  He gave me a written document. I don't
19  recall, I don't have the document in front of me, but
20  on or about mid March he gave me a document basically
21  encompassing his results.
22          MS. KRUGER: Okay. Where were we with the
```

```
                                    15
 1  other exhibits? We can just mark this as the next
 2  one.
 3              - - -
 4          (Discussion off the Record)
 5              - - -
 6          MS. KRUGER: Why don't we mark this as 18.
 7  Or, actually, I'm sorry, why don't we mark this as 18.
 8              - - -
 9          (A document was marked as Deposition
10  Exhibit Number 18)
11              - - -
12          BY MS. KRUGER:
13      Q.  Okay. You have been handed what's been
14  marked Exhibit 18. And this is the memorandum that
15  was prepared by Mr. Sittner on March 22, 2004?
16      A.  Yes, ma'am.
17      Q.  And did you receive a copy of this
18  memorandum?
19      A.  I believe I did.
20      Q.  Okay.
21      A.  Yes.
22      Q.  All right. Can you turn to page 4?
```

```
                                    16
 1      A.  Sure.
 2      Q.  There's some handwriting on the last page,
 3  on page 4. Do you know whose handwriting that is?
 4      A.  That would be mine.
 5      Q.  Okay. And can you read what it says?
 6      A.  Indeed, Mr. Sittner's investigation,
 7  terminate Mr. Brathwaite's employment, in violation of
 8  the IRP, assaulting another person, slash, security
 9  officer. And then below that is my initial.
10      Q.  Okay. Now, did Mr. Sittner come to a
11  conclusion in this report?
12          MR. BROWN: I'll just object to the extent
13  the document speaks for itself.
14      A.  As I read the document, ma'am, he came to a
15  conclusion based on the results of his investigation.
16      Q.  Did, in other words the decision to
17  terminate Mr. Sittner, was Mr. -- I mean not
18  Mr. Sittner, Mr. Brathwaite, was Mr. Sittner
19  recommending to you that Mr. Brathwaite be terminated?
20      A.  In the document, madame?
21      Q.  Yes.
22      A.  I'd have to reread this. There may or may
```

```
                                    17
 1  not be a recommendation in there. I do not know.
 2      Q.  Okay. But on the last page of the
 3  document, page 4, at the top of the page, Mr. Sittner
 4  is writing I believe that Officer Brathwaite was the
 5  aggressor in this matter?
 6      A.  Um-hmm.
 7      Q.  I also believe that he has lied in his
 8  statements?
 9      A.  Um-hmm.
10      Q.  Okay. Did Mr. Sittner discuss this
11  investigation with you?
12      A.  Only what was on the document, I believe.
13      Q.  Did he have a conversation with you about
14  his investigation?
15      A.  I believe he did.
16      Q.  Okay. And --
17      A.  I believe we went over the document
18  together.
19      Q.  Okay. Was Mr. Verdine suspended at all?
20      A.  I don't know, madame.
21      Q.  Okay. Did Mr. Verdine receive any kind of
22  written reprimand?
```

**Page 18**

1  A. Without having his file, I don't know that
2  either.
3  Q. Do you know whether he received an oral
4  reprimand?
5  A. I don't know that either.
6  Q. Okay. Did you ask Mr. Sittner about that?
7  A. About?
8  Q. About whether Mr. Verdine had received any
9  kind of reprimands?
10 A. I did not.
11 Q. Either written or oral?
12 A. As I said, we went over the document
13 together. Mr. Verdine did not appear to be the
14 aggressor in the matter, so I would not have asked him
15 normally anyway. I would not ask the Chief of Guards
16 in this case, or the local manager, to reprimand or
17 counsel an individual who was what we believed in this
18 specific case not the aggressor in the action, the
19 incident.
20 Q. Okay. Did you -- were you aware that
21 Mr. Brathwaite pushed Mr. -- I'm sorry. Were you
22 aware that Mr. Verdine, during this incident, pushed

**Page 19**

1  Mr. Brathwaite?
2  A. I think that's in here, although I don't --
3  I believe that there was -- I believe "yes" is the
4  answer whereby Mr. Verdine did push Mr. Brathwaite, I
5  believe, but I'd like to read that.
6  Q. Well, you can take your time and read
7  through this.
8       MR. BROWN: It wouldn't be a bad idea to
9  read through it.
10      THE WITNESS: Yeah, let me go ahead.
11          - - -
12      (The witness reviews a document)
13          - - -
14 A. Yes, paragraph 2, Verdine pushed
15 Brathwaite.
16 Q. And maybe I should say this differently,
17 did -- do you know whether Mr. Sittner concluded, or
18 in your conversations with Mr. Sittner did he tell you
19 that he believed that Mr. Verdine pushed
20 Mr. Brathwaite?
21 A. During a verbal conversation?
22 Q. During this incident?

**Page 20**

1  A. When we were going through the document
2  together, he had told me that Verdine -- I believe he
3  had told me that Verdine had in fact pushed
4  Mr. Brathwaite.
5  Q. Did he also -- did Mr. Sittner also tell
6  you that Mr. Verdine had spit on Mr. Brathwaite?
7  A. No. I don't recall him telling me that.
8  Q. Do you want to look at page 3 of the
9  document?
10 A. Please.
11 Q. At the bottom paragraph beginning with
12 "Officer Patrick Hayes."
13      MR. BROWN: Now is your question, Susan,
14 that Mr. Sittner concluded that he had spit or it was
15 reported that there was an allegation that he spit?
16 Those are two different things.
17      MS. KRUGER: Okay. Well, I'll let him read
18 the document first.
19      MR. BROWN: Well, I want to know what your
20 question is. So before you answer, let's hear the
21 question again. Go ahead and read what she's told you
22 to read.

**Page 21**

1       THE WITNESS: Okay. I'm sorry.
2       BY MS. KRUGER:
3  Q. All right. Well, let's even go back to the
4  first question. Regarding whether or not Mr. Verdine
5  had pushed Mr. Brathwaite, do you know if Mr. Sittner
6  concluded that Mr. Verdine had in fact pushed
7  Mr. Brathwaite as a result of his investigation?
8  A. As part of the conversation?
9  Q. Did he talk to you about that, about what
10 he believed happened?
11 A. I don't recall the specificity of the
12 conversation other than what was -- what we had gone
13 through the document together.
14 Q. All right. And so you saw in the document
15 that there were allegations by in fact more than, you
16 know, more than a couple of people that -- people
17 besides Mr. Brathwaite that Mr. Verdine had in fact
18 pushed Mr. Brathwaite?
19 A. Yes.
20 Q. Okay. And now in looking at page 3 of this
21 document, do you see there's an allegation that
22 Mr. Verdine had spit on Mr. Brathwaite?

Page 22

1   A.   I see that.
2   Q.   Okay. Were you aware of this at the time
3   that -- or did you discuss the fact that there was an
4   allegation that Mr. Verdine had spit on
5   Mr. Brathwaite?
6   A.   That there was an allegation, yes.
7   Q.   Had you discussed that with Mr. Sittner?
8   A.   Yes.
9   Q.   Okay. Did Mr. Sittner tell you whether he
10  had concluded whether or not Mr. Verdine had in fact
11  spit on Mr. Brathwaite?
12  A.   According to the document, Mr. Hayes, the
13  Department of the Army Police officer, Hayes spoke
14  with Brathwaite and related the following information
15  in the course of the last bullet. Brathwaite claimed
16  that Verdine pushed him once and spit on him once.
17       MR. BROWN: But her question is did
18  Mr. Sittner conclude that the spitting had taken
19  place?
20  A.   I don't believe so.
21  Q.   Okay. Do you recall that -- did you recall
22  even having a discussion with Mr. Sittner regarding

Page 23

1   the spitting?
2   A.   I recall going through the document with
3   him, madame.
4   Q.   Okay. Now, you didn't personally interview
5   Mr. Brathwaite?
6   A.   I did not.
7   Q.   And you didn't talk to Mr. Verdine?
8   A.   I did not.
9   Q.   And you didn't talk to Mr. Blassingame?
10  I'm not sure I'm pronouncing that right.
11  A.   No. I don't recall speaking to anyone
12  specifically outside of Mr. Sittner regarding this
13  particular matter.
14  Q.   Okay. Have there been any other instances
15  where employees have gotten into fights?
16  A.   At Walter Reed specifically, madame, or
17  elsewhere, or in my 18 years, or --
18  Q.   Well, let's talk about --
19  A.   I'm not being smart. I just don't know how
20  your question --
21  Q.   Well, let's start with Walter Reed. And
22  let's talk about security officers. Do you know of

Page 24

1   any other instances during the time that, well,
2   actually I thought you had said you had been there
3   since April '01; right?
4   A.   At Walter Reed.
5   Q.   At Walter Reed. Okay.
6   A.   Or Vance. I've been with Vance since April
7   '01.
8   Q.   So since you have been with Vance, have
9   there been any other Vance employees who have gotten
10  into fights --
11  A.   Yes.
12  Q.   -- that you know of?
13  A.   There have been altercations, yeah, between
14  employees.
15  Q.   Okay. And how many of those have there
16  been?
17  A.   Less than a handful.
18  Q.   Okay. Do you remember the specifics about
19  any of these incidents?
20  A.   The handful I am referencing?
21  Q.   Yes.
22  A.   No, ma'am.

Page 25

1   Q.   Do you remember whether anyone was
2   terminated as a result of the fights?
3   A.   Not specifically. Although that is clearly
4   an option.
5   Q.   Right. I understand that.
6   A.   Termination is absolutely an option.
7   Q.   But you don't remember in any of these
8   cases that you are thinking of whether anyone was
9   terminated?
10  A.   No. I don't know.
11  Q.   Okay. You didn't view the -- you didn't
12  view the videotape from the cameras?
13  A.   I did not.
14  Q.   Okay. Do you know anything, I am not sure
15  if I asked you this before, do you know anything about
16  Mr. Verdine's job performance?
17  A.   I do not.
18  Q.   Okay. And what was the reason why
19  Mr. Brathwaite was fired?
20  A.   Well, as I wrote on the back here,
21  basically assaulting another security officer, based
22  on the investigation.

Page 26

1   Q.   And basically your justification for firing
2   Mr. Brathwaite was your conversation with Mr. Sittner
3   and this memorandum that he prepared for you, Exhibit
4   18?
5   A.   In large part, yes. As a matter of fact,
6   "yes" is the answer.
7   Q.   Okay. Has Mr. Sittner ever recommended
8   that anyone else be fired?
9   A.   In the course of his employment with Vance
10  or --
11  Q.   Yes, you know, while --
12  A.   Oh, absolutely. Yes.
13  Q.   And do you generally agree with his
14  recommendations?
15  A.   Generally.
16  Q.   Okay. Has there ever been an occasion
17  where you have not agreed with his recommendation?
18  A.   Oh, I am sure there has. Oh, yeah, there
19  have been cases for a variety of managers at the local
20  level, be it Mr. Sittner or otherwise, where I don't
21  agree with it, with termination or a specific
22  disciplinary process.

Page 27

1   Q.   Any instances where it has -- the
2   recommendation for termination was because there was a
3   fight or an assault?
4   A.   Can you restate the question please?
5   Q.   Have you ever disagreed with a
6   recommendation for termination when the incident that
7   was -- that gave rise to the recommendation was a
8   fight between employees?
9   A.   Nothing stands out in my mind.
10  Q.   Have there been instances when employees
11  were -- got into fights with each other and when they
12  weren't -- and no one was terminated as a result of
13  that?
14  A.   Again, of those handful over the past
15  number of years, I can't say with any certainty one
16  way or the other.
17  Q.   Okay.
18  A.   Fighting on duty -- I will say this,
19  madame, fighting on duty is not a good thing for a
20  variety of reasons, especially people with weaponry on
21  their person. And it's something I frown upon highly,
22  regardless of the color of the individual.

Page 28

1        MS. KRUGER: Okay. If you could show him
2   this document. And if you could mark that as Exhibit
3   19.
4                        - - -
5        (A document was marked as Deposition
6   Exhibit Number 19)
7                        - - -
8        BY MS. KRUGER:
9   Q.   Have you ever seen this document before?
10  A.   I have not.
11  Q.   Okay. Do you know whose handwriting is on
12  this document?
13  A.   I do not.
14  Q.   Okay.
15  A.   It surely is not mine. I can read it.
16  Q.   Okay. Did you ever read over any of the
17  statements that Mr. Sittner obtained from
18  Mr. Brathwaite and Mr. Verdine or any of the other
19  witnesses?
20  A.   I can't say for sure either way. I don't
21  believe I did.
22  Q.   Okay. Now, Mr. Verdine was terminated at

Page 29

1   some point from his employment?
2   A.   He may have been.
3   Q.   Okay. You don't have any knowledge of
4   that?
5   A.   No, ma'am.
6   Q.   Okay.
7   A.   Well, that's not exactly true. I had a
8   conversation with Mr. Jackson, Friday, who had told me
9   that the gentleman had been terminated, or asked me --
10       MR. BROWN: Okay. You are not supposed to
11  tell anything that you and I talked about.
12       THE WITNESS: Oh, I'm sorry. Okay. I just
13  became aware of that on Friday.
14       MS. KRUGER: Okay. All right. I don't
15  have any further questions.
16       MR. BROWN: Thank you. No questions. He
17  will read.
18                        - - -
19       (The deposition was concluded at 1:33 p.m.)
20                        - - -
21
22