**EXHIBIT E**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x

ENRIQUE BRATHWAITE,                    :

       Plaintiff,              :

    vs.                                :  Case No.

VANCE FEDERAL SECURITY SERVICES,       :  2006-CA-003877B

INC.,  :                               :

       Defendants              :

- - - - - - - - - - - - - - - - -x


Deposition of THOMAS SITTNER, held at the offices of Jackson Lewis, LLP, 8614 Westwood Center Drive, Suite 950, Vienna, Virginia, commencing at 1:39 p.m., Monday, November 27, 2006, before Elizabeth Mingione, Notary Public.


HENDERSON LEGAL SERVICES

1015 15th Street, Suite 525

Washington, D.C. 20005

Page 6

1  interrupt me. And wait until I finish the question
2  before you answer, because then it will make the
3  transcript a lot easier to read.
4      Do you understand?
5  A. I will.
6  Q. Okay. Do you have any questions?
7  A. None.
8  Q. Okay. How long have you been employed by
9  Vance?
10 A. About three-and-a-half years.
11 Q. And what is your current position?
12 A. I am the managing director of the -- I'm
13 sorry, one of two managing directors for the Maryland
14 D.C. region of Vance Uniform Protection Services.
15 Q. And how long have you held that position?
16 A. I came over here in July of 2006.
17 Q. And prior to that what was your position?
18 A. Before I came to this job, I was the
19 operations manager for Region 2 of Vance -- I am
20 sorry, Vance Federal Protective Services.
21 Q. And was that the position that you held
22 while Mr. Brathwaite was employed by Vance?

Page 7

1  A. No.
2  Q. Okay. So how long were you the operations
3  manager for Region 2?
4  A. About a year and a half.
5  Q. And what was your position prior to that?
6  A. Before that, I was the quality assurance
7  manager for the what we call the Army contract. And
8  although I was a Vance employee, I also had oversight
9  of military installations that were under the control
10 of Chenega Integrated Systems.
11 Q. Okay. And how long did you have that job?
12 A. It was about a year.
13 Q. All right. Now, was that -- did you have
14 that job when Mr. Brathwaite was an employee?
15 A. No.
16 Q. Okay. Let's go back. What was the job
17 before that?
18 A. Before that, I was the project manager at
19 Walter Reed Army Medical Center.
20 Q. And how long did you hold that job?
21 A. About eight months.
22 Q. And is that the job you had while --

Page 8

1  A. Yes.
2  Q. -- Mr. Brathwaite was employed? Okay. All
3  right.
4      MR. BROWN: Wait till she finishes her
5  whole question.
6      THE WITNESS: I am sorry.
7      BY MS. KRUGER:
8  Q. All right. So you were the project manager
9  at Walter Reed Army Medical Center at the time that
10 Mr. Brathwaite was an employee?
11 A. Yes.
12 Q. Okay. And what were your general job
13 duties at that time?
14 A. My duties involved all aspects of the
15 operation of that contract. We -- I interacted with
16 the client. I gave out job assignments, delegated
17 duties to other members of the staff, conducted
18 inspections, evaluations, reviewed written
19 documentation, saw to it that required tasks were
20 completed, payroll, performance evaluations.
21     Essentially everything that occurred at the
22 installation under this contract I was ultimately

Page 9

1  responsible for.
2  Q. Okay. Now, Mr. Brathwaite was employed as
3  a security officer. Is that correct?
4  A. Yes.
5  Q. Okay. And how many security officers were
6  employed at Walter Reed?
7  A. The number fluctuated, but usually it was
8  around 80, perhaps as many as 90.
9  Q. And when did you first meet Mr. Brathwaite?
10 A. We had a job fair approximately the first
11 of September 2003. I'm pretty certain that I first
12 met him on the first or second day of the job fair.
13 Q. Did you interview him for a position?
14 A. I don't recall if I did or if it was
15 Mr. Lewis.
16 Q. Okay. Were you the person who decided to
17 hire Mr. Brathwaite?
18 A. It could have been me or it might have been
19 Mr. Lewis.
20 Q. Did you have -- prior to the incident
21 involving Mr. Verdine, did you have any interaction at
22 all with Mr. Brathwaite while he was employed for

**Page 10**

1  Vance?
2  A.  Yes.
3  Q.  And how often would you see Mr. Brathwaite
4  during a week?
5  A.  I honestly don't know. Maybe on average
6  once a week.
7  Q.  Okay. Now, would that be the same for all
8  of the security officers that generally you saw them
9  once a week or would you -- or would you have seen
10 Mr. Brathwaite more or less than others?
11 A.  Some officers I'd see frequently based on
12 their schedule, their post assignment. Others I would
13 see much less frequently.
14 Q.  Okay. What about Mr. Verdine? How often
15 did you see Mr. Verdine?
16 A.  I would guess about the same as
17 Mr. Brathwaite.
18 Q.  Okay. Prior to the incident between
19 Mr. Brathwaite and Mr. Verdine, were you aware of any
20 performance issues involving Mr. Brathwaite?
21 A.  I can't specifically recall that I was at
22 that time.

**Page 11**

1  Q.  And how about Mr. Verdine? Would you --
2  were you aware of any performance issues involving
3  Mr. Verdine prior to the incident involving the two
4  men?
5  A.  Once again, I don't recall any with him
6  either.
7  Q.  Okay. Who did Mr. Brathwaite report to?
8  A.  It could have been any one of a number of
9  different people depending on his shift and the
10 supervisors who were on duty at the time.
11 Q.  Do you know who his supervisor or
12 supervisors would have been on the date of the
13 incident involving Mr. Brathwaite and Mr. Verdine?
14 A.  Yes, I do. I believe so.
15 Q.  Okay. And who would they have been?
16 A.  That would have been Charles Green.
17 Q.  Would he also have been the supervisor for
18 Mr. Verdine as well?
19 A.  Yes.
20 Q.  And what was Charles Green's position at
21 that time?
22 A.  At that time he was a part-time supervisory

**Page 12**

1  weekend lieutenant.
2  Q.  Okay. What about Gloria Williams, would
3  she also have been a supervisor of Mr. Brathwaite?
4  A.  Conceivably, yes.
5  Q.  And what was, now, did Ms. Williams and
6  Mr. Green, did they have the same kind of job?
7  A.  Yes.
8  Q.  Okay. And what were their duties in
9  general?
10 A.  Well, as a supervisor, their duties were to
11 issue weapons and other equipment to officers coming
12 on and off duty, make certain that the posts were
13 staffed, calling people if they needed someone to
14 staff a post, and do post inspections, make certain
15 that things were being done as they were supposed to
16 be; just provide a general overall supervisory
17 presence.
18 Q.  So they supervised more than one post?
19 A.  Yes.
20 Q.  Okay. So they would not have always been
21 in the same place as Mr. Brathwaite and Mr. Verdine?
22 A.  No.

**Page 13**

1  Q.  Okay. Do you know, well, let me just ask
2  you this. When people first become employed by Vance,
3  when the security officers first become employed by
4  Vance, are they put on some sort of probation?
5  A.  No.
6  Q.  Okay. So neither Mr. Brathwaite nor
7  Mr. Verdine would have been probationary employees at
8  the time of the incident?
9  A.  No.
10 Q.  How did you learn about the incident
11 involving Mr. Brathwaite and Mr. Verdine?
12 A.  I believe I received a phone call the date
13 it occurred from Lieutenant Green.
14 Q.  And what did Lieutenant Green tell you?
15 A.  That there had been an altercation between
16 the two. I am certain he told me more. I don't
17 specifically recall what that was at this time.
18 Q.  Okay. And after you got that phone call,
19 what did you do?
20 A.  Told him to get statements from all the
21 parties involved, or witnesses, to separate them, and
22 I would deal with it on Monday.

**14**

1  Q. What day of the week did the incident
2  occur?
3  A. I believe it was a Saturday.
4  Q. Okay. Now, did Mr. Green in fact get
5  statements from witnesses?
6  A. He did.
7  Q. Do you know who he talked to?
8  A. I believe he spoke with everyone who was
9  present at the time this occurred.
10 Q. Okay.
11         - - -
12     (A document was marked as Deposition
13 Exhibit Number 20)
14         - - -
15     BY MS. KRUGER:
16 Q. We've handed you what's been marked Exhibit
17 20. Do you know who wrote this?
18 A. Not definitively. I believe it is Charles
19 Green.
20 Q. Did you see this, what's been marked
21 Exhibit 20, have you seen this before?
22 A. I'm reasonably certain I did at the time,

**15**

1  not since.
2  Q. Okay. Did Mr. -- or what is he, a
3  lieutenant? Did Lieutenant Green discuss this
4  statement with you?
5  A. Well, I'm sure we must have discussed it,
6  just -- I guess so.
7  Q. Do you recall having a conversation with
8  Lieutenant Green about the incident?
9  A. Yes.
10 Q. Okay. Do you recall what Lieutenant Green
11 told you?
12 A. Well, once again, just that there had been
13 an incident, that he had gotten statements. And I
14 would review the statements and deal with it the
15 following Monday.
16 Q. Okay. If you look at page 2 of Exhibit 20,
17 if you look at the -- starting with go up to the sixth
18 line after where it says, "nothing follows," and then
19 if you count six lines above that, there's a sentence
20 that starts out, "At a minimum, each officer should be
21 suspended for a lengthy period."
22 A. I see. At a minimum each officer should be

**16**

1  suspended. Yes. I do see that.
2  Q. Okay. Did Mr. -- did Lieutenant Green
3  discuss with you his feelings that both officers
4  should be suspended at a minimum?
5  A. If he did, I don't recall having that
6  conversation.
7  Q. Okay. This will be Exhibit 21.
8         - - -
9     (A document was marked as Deposition
10 Exhibit Number 21)
11        - - -
12     BY MS. KRUGER:
13 Q. Have you had a chance to look at Exhibit
14 21?
15 A. I did.
16 Q. Okay. And do you know whose handwriting is
17 on that exhibit?
18 A. Well, I don't recognize the handwriting,
19 but from the way it's produced I believe it was by
20 Officer Barnett on page 1. And then beginning about
21 almost halfway down, the narrative section, it appears
22 to change to someone else producing the writing. And

**17**

1  I'm going to assume that was Lieutenant Green.
2  Q. Okay. Did you review this -- did you
3  review this Exhibit 21 prior to making your decision?
4  A. I am sure I did.
5  Q. Okay. Now, on page 2 of Exhibit 21, it
6  appears that Joseph Barnett has signed the statement?
7  A. Yes.
8  Q. Okay. And you also talked to Mr. Barnett?
9  A. Yes.
10 Q. During the course of your investigation?
11        - - -
12     (A document was marked as Deposition
13 Exhibit Number 22)
14        - - -
15     BY MS. KRUGER:
16 Q. Have you had a chance to review what's been
17 marked as Exhibit 22?
18 A. Yes.
19 Q. Is this something that you prepared?
20 A. I did.
21 Q. Okay. And according to the date on the top
22 it states that you took this statement on March 18,

**Page 22**

1  guess I spoke with him also. Frankly, I don't
2  remember who he is. And I may be having difficulty
3  putting a name to a face, but obviously I spoke with
4  Mr. Belcher.
5      Q.  Okay. And it says then a couple lines down
6  it says, "Did not ask for a napkin to wipe spit."
7      A.  Um-hmm.
8      Q.  What was that about?
9      A.  Well, apparently Mr. Brathwaite was sitting
10 there with what was purported to be spit on his face.
11     Q.  And when was this?
12     A.  When he went to the provost marshal's
13 office to report the incident.
14     Q.  So, now who's giving you this information?
15     A.  I'm going to assume it was Mr. Belcher,
16 Officer Belcher.
17     Q.  Okay. So you believe Officer Belcher told
18 you that Mr. Brathwaite had spit on his face when he
19 went to the provost marshal's office?
20     A.  Well, I think we agreed that he had a
21 liquid on his face. I don't think that anyone -- I
22 don't believe based on my conversation with the

**Page 23**

1  officer that they actually believe that's what it was.
2      Q.  So what did Mr. Belcher think it was?
3      A.  Well, it was a liquid. But, frankly, he
4  and I and others had some difficulty believing that
5  anyone walked around with spit on their face, someone
6  else's spit on their face.
7      Q.  Do you know how long he had been -- did
8  Mr. Belcher tell you how long Mr. Brathwaite had the
9  liquid on his face?
10     A.  If he did, I don't recall.
11     Q.  Well, let me ask you this. You were
12 present during the testimony of Mr. Brathwaite today?
13     A.  Yes.
14     Q.  Okay. And you heard Mr. Brathwaite discuss
15 his version of what happened. Isn't that correct?
16     A.  Yes.
17     Q.  Okay. And Mr. Brathwaite said that he, you
18 know, immediately after the incident occurred, he went
19 to the provost marshal's office?
20     A.  Yes.
21     Q.  So he wouldn't have been walking around
22 with spit on his face for very long. Isn't that true?

**Page 24**

1      A.  I hate to quibble, but very long takes on a
2  different meaning. Any amount of time with spit on my
3  face is too long.
4      Q.  Okay. So it's your opinion that no one
5  would want to have spit on their face for any time at
6  all. They would have immediately wiped it off?
7      A.  That's been my experience.
8      Q.  Okay. And that's why you felt that
9  Mr. Brathwaite wasn't telling the truth?
10     A.  Well, that was simply one of a number of
11 issues that led me to believe that Mr. Brathwaite was
12 lying.
13     Q.  Okay. And what did you think that he had
14 put on his face?
15     A.  Well, I really didn't know.
16     Q.  Okay. And did anyone else feel the same
17 way?
18     A.  I believe that everyone who has become
19 acquainted with this case found it difficult, if not
20 impossible, to believe that he was walking around with
21 spit on his face.
22     Q.  In what other way did you decide that

**Page 25**

1  Mr. Brathwaite had been lying?
2      A.  Well, once again, once you read the
3  statements and, you know, Mr. Barnett's was fairly
4  clear and unequivocal, Mr. Brathwaite was the
5  aggressor. Mr. Brathwaite struck Mr. Verdine first.
6  Mr. Barnett, who obviously would have seen had
7  Mr. Verdine spit on Mr. Brathwaite, says he did not.
8          And there was another -- at least a
9  statement which I recall or a phrase and a statement,
10 I believe given by Mr. Verdine where -- I'm sorry,
11 Mr. Verdine and/or someone elsewhere he uttered, Don't
12 push me, just before he pushed Mr. Brathwaite. Once
13 again within my experience when someone utters
14 something on the spur of the moment like that, it
15 generally is indicative of that's what happened, as
16 opposed to saying at a later date, well, he pushed me
17 and I said don't.
18     Q.  All right. I guess this is going to be
19 Exhibit 23.
20              - - -
21         (A document was marked as Deposition
22 Exhibit Number 23)

10 (Pages 34 to 37)

Page 34

1   Q. Was that because he did not want to sign
2   the statement?
3   A. No.
4   Q. Why did you put him on suspension?
5   A. At that point, I had done virtually
6   everything that I felt was necessary to determine what
7   my final recommendation was going to be. And at that
8   point, I determined that he was the aggressor, that he
9   was lying in the course of the investigation. And for
10  those reasons I decided to suspend him, pending final
11  resolution.
12  Q. And when you say pending final resolution,
13  what do you mean by that?
14  A. Well, I had to gather all the information
15  together, send it forward to Mr. McManus with a
16  recommendation, and wait for his review and permission
17  to terminate, if indeed he agreed with my
18  recommendation.
19  Q. Okay. Now, was Mr. Brathwaite the first
20  person that you had recommended to terminate?
21  A. No.
22  Q. How many other people did you recommend to

Page 35

1   terminate?
2   A. At that point, I think there was only one.
3   Q. All right. And was that -- why had you
4   recommended, well, let me ask you this. Why did you
5   recommend to terminate that person?
6   A. The other person?
7   Q. Right.
8   A. Tardiness.
9   Q. Okay. And was that person terminated?
10  A. Yes.
11  Q. And did Mr. McManus have to approve that
12  termination?
13  A. Sure he did.
14  Q. Now, had you already reviewed the -- let me
15  ask you this. There were cameras at the site that had
16  recorded what happened during the incident between
17  Mr. Brathwaite and Mr. Verdine?
18  A. Yes, as to cameras; no, as to recorded
19  everything that happened.
20  Q. Okay. Did you look at film from the, well,
21  let me ask you this. How many cameras were there?
22  A. I don't know.

Page 36

1   Q. More than one?
2   A. I don't know.
3   Q. Did you review the film from any of these
4   cameras?
5   A. Yes.
6   Q. And how did you get the film?
7   A. The provost marshal's office retained the
8   film and the ability to view it. And I did so in
9   their office.
10  Q. Do you know if they still have the film?
11  A. I have no idea.
12  Q. And when you reviewed the film, what did it
13  show?
14  A. Nothing conclusive. I don't recall
15  specifically what it did show except that there was
16  nothing -- there was no smoking gun. There was no
17  "aha" moment. There was nothing that led one to
18  believe one way or the other.
19  Q. Have any other employees, any other
20  security officers gotten into fights; do you know of?
21  A. Of my own personal knowledge?
22  Q. Or that you have heard about?

Page 37

1   A. Yes.
2   Q. Okay. How many of these kinds of fights
3   have you heard about?
4   A. Not many. They are fairly infrequent, I
5   would hope.
6   Q. Okay.
7   A. Perhaps a handful. One that comes to mind.
8   Q. Okay. All right. Let's -- the one that
9   comes to mind, how long ago was that?
10  A. I believe it was several months after this
11  incident, although I don't know when.
12  Q. Okay. Now are you talking about the second
13  incident involving Mr. Verdine?
14  A. Indeed.
15  Q. Okay. Aside from that incident involving
16  Mr. Verdine, were there ever any other incidents that
17  you recall involving fights between security officers?
18  A. No. That's the only one that I have a real
19  memory of, a knowledge of.
20  Q. Okay. The fight that Mr. Verdine was
21  involved in the second time, this involved an Officer
22  Hales or Sergeant Hales? Is that correct? You don't

**Page 38**

1  know?
2  A. I think it was Joseph Hales. I didn't know
3  he was a sergeant, if he was.
4  Q. Okay. Now, do you know what race Mr. Hales
5  is?
6  A. I do.
7  Q. And what race is he?
8  A. He is black.
9  Q. Okay. How did you find out about the
10 incident involving Mr. Verdine and Mr. Hales?
11 A. It was in conversation. And by that I mean
12 I don't believe I knew about it based on my position.
13 In other words, I was not part of the chain of command
14 that would have reviewed that incident.
15     Part of my duties would be to interact with
16 the chiefs on a regular basis. And at some point I
17 became aware that Mr. Verdine and Mr. Hales had both
18 been terminated. And I just got a general description
19 of what had occurred.
20 Q. Okay. You had said regarding going back to
21 the incident involving Mr. Verdine and Mr. Brathwaite,
22 you spoke with Mr. Blassingame and Mr. Barnett. Did

**Page 39**

1  you speak with anyone else, any of the other security
2  officers who were present when the incident occurred?
3  A. I believe I spoke with Mr. Collins.
4  Q. Okay. Did you write a report for
5  Mr. Collins?
6  A. I thought I did. It's conceivable, based
7  on his inability to recollect anything, that I might
8  not have. But I'm just not certain at this moment.
9  Q. So Mr. Collins told you he couldn't
10 recollect the incident?
11 A. Mr. Collins apparently didn't recollect
12 much of anything. I believe it was Collins.
13 Q. Did you speak with anyone else besides
14 Blassingame, Barnett and Collins?
15 A. I spoke with a captain. His name escapes
16 me.
17 Q. Was it Captain Poulson?
18 A. It could have been. I don't recall even
19 how I had his contact information, but I did. And I
20 spoke with him. But other than to find out from him
21 that an altercation had occurred, he had nothing to
22 add that assisted me in determining who was the

**Page 40**

1  aggressor, et cetera.
2  Q. Was Captain Poulson present at the time
3  that the fight occurred?
4  A. He was present for some portion. Once
5  again, I think he was, if I recall correctly, he was
6  leaving the installation. And as he was driving
7  through the access control point, obviously witnessed
8  some portion of the altercation.
9  Q. Would there have been any other security
10 officers present during the incident?
11 A. In an on-duty status, there should not have
12 been. No.
13 Q. So it should have just been Collins,
14 Barnett, Blassingame, Brathwaite and Verdine?
15 A. Correct.
16 Q. Okay. You were here during
17 Mr. Brathwaite's testimony earlier today?
18 A. Yes.
19 Q. Okay. And you listened to his testimony?
20 A. Yes.
21 Q. And was there anything in his testimony
22 that you disagreed with?

**Page 41**

1      MR. BROWN: Other than what he's already
2  testified to?
3  A. Well, yeah, a great deal.
4  Q. What did you disagree with?
5  A. Well, his version of how the event
6  occurred.
7  Q. Anything else?
8  A. It's fairly broad. You know other than the
9  fact that they were all at work that day, and that
10 there was some kind of an altercation, his version of
11 the facts does not appear to be supported by any of
12 the witnesses or other evidence.
13     So to say that I disagree with his version
14 of the facts, all the pertinent facts I guess I would
15 have to say I pretty much disagreed with. He claims
16 to have been struck by a shotgun. He claims to have
17 been spit upon. He claims that Verdine was going to
18 beat him up.
19     None of that appears to be supported by any
20 of the facts.
21 Q. And by the facts you are talking about the
22 statements from Barnett and Blassingame?